**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA., | : Criminal Action No. 19-134 (FLW) |
| Plaintiff, | : **OPINION** |
| v. | : |
| TIMOTHY WIMBUSH, | : |
| TAQUAN WILLIAMS, AND | : |
| JUBRI WEST | : |
| Defendants. | : |

**WOLFSON, United States District Chief Judge**:

This matter comes before the Court on a motion to suppress filed by defendants Timothy Wimbush ("Wimbush"), Taquan Williams ("Williams"), and Jubri West ("West") (collectively, ("Defendants"). *See* ECF Nos. 363; 364 and 368. Defendants seek to suppress physical evidence, guns and drugs, seized 1) during a pat down search and vehicle search following a traffic stop, and 2) during a vehicle search pursuant to a subsequently duly executed search warrant. On January 14 and 16, 2020, this Court held an evidentiary hearing on Defendants' motion. For the following reasons, Defendants' motion to suppress is **DENIED**.

I.    FACTUAL BACKGROUND[1]

I.    The Wiretap and September Shootings

---

[1]    Unless otherwise noted, the facts recited herein are derived from the transcript of the suppression hearing and are largely undisputed. *See* ECF Nos. 433, Suppression Hearing Transcript, Vol. 1, dated 1/14/2020 ("1T"); 434, Suppression Hearing Transcript, Vol. 2, dated 1/16/2020 ("2T"). During the hearing, the Court heard testimony from Detective Katherine Cox ("Detective Cox"), Detective Alex Maldonado ("Detective Maldonado"), Detective Eliezer Ramos ("Detective Ramos"), Sergeant Scott Kivet ("Sergeant Kivet"), Sergeant-Detective David Ordille ("Sergeant Ordille"), and Joseph Wright. Any factual discrepancies from the officers' testimony will be discussed in greater detail, *infra*.

Throughout the events at issue, the "Greater Trenton Safe Streets Task Force" (the "Task Force") was engaged in an ongoing investigation of an alleged narcotics distribution scheme in New Jersey, specifically Mercer county and the greater Trenton area.[2]  *See* 1T 6:8-19; 1T 9:3-8; 10:16-19.  The Task Force's objective is purportedly to conduct long-term investigations into violent offenders, including via the use of wiretaps, in order to secure federal indictments. 1T 63:7-13.  As part of the investigation, the Task Force obtained, among other things, a wiretap for the telephone of Jakir Taylor.  1T 10:3-7.

Katherine Cox, a detective with the Trenton Police Department, was the co-case agent for the Task Force, along with FBI Special Agent Rachel Kovacs.  As co-case agent, Detective Cox's tasks involved coordinating and supervising the surveillance team, which was largely comprised of local law enforcement officers, and she monitored intercepted-communications in the wiretap room.  1T 10:16-20.

On September 1 and 2, 2018, the days leading up to the search at issue, there were two separate shootings in the Trenton area, during which friends, family members, and associates of defendant Wimbush were shot.  On September 1, 2018, there was a shooting near 137 Hoffman Avenue, where a female associate of Wimbush was injured.  1T 17:18-18:12; 1T 27:13-28:25; *see also* Ex. 31, Trenton Police Department Incident/Investigation Report, dated 9/1/2018.  Radio transmissions in connection with the police response to the shooting reflect that local law enforcement believed that the intended target of the September 1st shooting may have been

---

[2]     The Task Force is a collaboration between the Federal Bureau of Investigations (the "FBI"); the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF"); and various local law enforcement agencies, including the Trenton Police Department, the Robbinsville Police Department, and the Mercer County Prosecutor's Office.

Wimbush.  Ex. 1, Trenton Police Department Radio Recording September; *see also* 1T 17:5-7, 15-17.

On September 2, 2018, another shooting happened near the intersection of Bryn Mawr and Stuyvesant Avenues, during which Preston Wimbush, defendant Wimbush's brother; Quiana Welch, a close associate of Wimbush's; and others  were injured.[3]  1T 13:3-19; 14:3-23; *see also* Ex. 29, Trenton Police Department Incident/Investigation Report, dated 9/2/2018.

Moments after that shooting, there was a second shooting near the intersection of West State Street and Lee Avenue, approximately one mile away.  1T 15:14-21; *see also* Ex. 30, Trenton Police Department Incident/Investigation Report, dated 9/2/2018.  Trenton Police Department radio transmissions contemporaneous to the shooting reflect that an officer had received information that "a grey, Volkswagen Passat with tinted windows was doing the shooting . . . ." Ex. 1, Trenton Police Department Radio Recording September 2, 2018; *see also* 1T 18:16-19-21. According to the transmission, in response to questioning from another officer, the reporting officer reiterated that the shooter's vehicle was "a Volkswagen Passat, possibly grey.  Tinted windows." *Id*. A second radio transmission from that evening reflects a different officer communicating the make, model, registration information, and license plate number of the vehicle involved, and identifies it as a green Volkswagen Passat registered to Timothy Wimbush.[4]  *See*

---

[3]      Throughout the wiretapped telephone recordings played at the suppression hearing, Ms. Welch referred to Wimbush as her "brother." *See generally* Ex. 12, Intercepted Telephone Call Between Jakir Taylor and Quiana Welch, September 6, 2018.  Detective Cox testified that during her investigation, she learned that Ms. Welch often referred to Wimbush as her brother, but Detective Cox was unsure whether there was a biological relationship between Ms. Welch and Wimbush.  1T 14:17-23.

[4]      The photographs of Wimbush's Volkswagen Passat, which were introduced into evidence at the suppression hearing, reflect that the vehicle is an olive green, however, one side of the vehicle has significant paint damage and appears grey. *See* Gov. Ex. 3, Photographs of the Volkswagen Passat.

Ex. 2; *see also* 1T 23:8-19.   Although Detective Cox was not involved in investigating the September 2nd shooting, that same day, law enforcement officers informed her that a Volkswagen Passat was involved in the shooting.   1T 25:17-20; 26:4-8.   At the suppression hearing, Detective Cox explained that as co-case agent of the Task Force, she would often receive calls from members of the Trenton Police Department advising her of shootings or other crimes occurring within the city.   1T 25:23-26:3.

## II.   The Stop of Wimbush's Volkswagen Passat

On September 4, 2018, Detective Sergeant David Ordille, from the Trenton Police department, observed a green Volkswagen Passat, and effectuated a motor vehicle stop of the Passat.   *See* 2T 194:4-14; *see also* Ex. 5, Trenton Police Department Filed Contact Report, September 4, 2018.   At the suppression hearing, Detective Sergeant Ordille testified that he stopped the vehicle because it "had front tinted windows and it matched the description of a vehicle suspected to be involved in [the September 2nd] shooting."   2T 220:19-25.   During the stop, Detective Sergeant Ordille conducted a brief investigation which consisted of speaking to Wimbush and taking "a quick look over the car through the windows."   2T 221:5-11.   Following the brief investigation, Detective Sergeant Ordille released Wimbush without issuing a summons or citation.   2T 221:5-15.   At the time, Detective Sergeant Ordille believed, based on information he had obtained from other law enforcement officers, that Wimbush was a suspended driver in New Jersey, however he did not personally confirm that information, nor did he prevent Wimbush from continuing to operate the vehicle.   2T 196:18-22; 221:21-222:7.   Detective Sergeant Ordille explained that the departmental policy on whether to allow suspended drivers to operate a vehicle after a traffic stop is left to the "officer's discretion."   2T 221:17-20.

That same day, September 4, 2018, Detective Cox learned from a confidential informant that Wimbush's Volkswagen Passat contained "an aftermarket stash box," or trap compartment, which Wimbush used to transport guns and weapons. 1T 35:17-22. At the suppression hearing, Detective Cox explained that earlier during the Task Force's investigation, on August 13, 2018, the same confidential informant informed her that one of Wimbush's vehicles contained a trap compartment, but at that time, the confidential informant could not identify the specific vehicle. 1T 36:12-37:3. Detective Cox documented the August 2018 contact with the confidential informant in a contact report which states that "[confidential informant] provided information on Target Timothy Wimbush," but does not specifically identify the information provided. *See* Gov't Ex. 33, 8/13/2018 Source Contact Report. Then, on September 4, 2018, the confidential informant informed Detective Cox that the trap compartment was located in the Volkswagen Passat. 1T 36:12-37:3. Detective Cox did not document that interaction with the confidential informant in a contact report. 1T 39:16-22. When questioned on the stand regarding why the contact was not documented, Detective Cox explained that it was an "oversight." 2T 74:18-75:6; 82:21-23. Although she did not formally document the contact, Detective Cox testified that she conveyed the information to all of the members of the surveillance team, including Detective Sergeant Ordille, and Detectives Ramos and Maldonado. 1T 40:3-13. Still, at the time he conducted the traffic stop of the Volkswagan Passat on September 4, 2018, Detective Sergeant Ordille was purportedly unaware of the trap compartment in the Passat. 2T 199:13-24.

At approximately 10:30 a.m. on September 4, 2018, the Task Force intercepted a telephone call on the wiretap between Jakir Taylor and an unidentified male, during which the two individuals discussed the September 2, 2018 shooting on Bryn Mawr Avenue. *See* Ex. 4, Intercepted Telephone Call between Jakir Taylor and Unidentified Male, September 4, 2018. In

cryptic terms, Jakir Taylor and the individual on the phone expressed their belief that the shootings were meant to target Wimbush and his associates, and that Wimbush would likely retaliate.  *Id.*  Although the call was intercepted that morning, it is unclear when Detective Cox listened to the recording of the phone call.

### III.    The September 6, 2018 Warrantless Search

On September 6, 2018, Detective Cox was positioned in the FBI wiretap room, and managing the surveillance team.  1T 46:21-24.  She directed Detective Maldonado to conduct surveillance on a target of the wiretap investigation, Taques Hall, who is also known as "Buddah."[5] 1T 46:21-24; 172:8-9.   During his surveillance, Detective Maldonado testified that he was positioned in the rear seat of an undercover vehicle near 52 Laurel Place facing Volk Street, in order to observe Buddah's vehicle.[6]  1T 172:18 to 173:4; 176:11-15; *see also* Ex. 36A, Trenton Area Map.   Between 2:20 p.m. and 2:25 p.m., a green Volkswagen Passat with heavily tinted windows, and no front license plate, drove down Volk Street and parked directly behind Detective Maldonado's unmarked surveillance vehicle.  1T 176:21-177:14. Detective Maldonado was unable to see the inside of the vehicle, and no one exited the vehicle.  *Id.*  The detective initially believed

---

[5]      The parties largely dispute the purpose of the law enforcement surveillance efforts that day. As will be discussed, *infra,* the Court credits the testifying officers' testimony that the surveillance was focused on Taques Hall or Buddah, and was not directed at defendant Wimbush or the other occupants of the Volkswagen Passat.

[6]      Detective Maldonado testified that he was parked in front of 52 Laurel Place.  However, the search warrant affidavit, which was drafted by another officer, attests that Detective Maldonado was located in front of "52 Laurel Avenue" and "was positioned in the area of Laurel Avenue and Laurel Place."  *See* Ex. 9, Search Warrant Affidavit, ¶8.  Detective Maldonado testified that Laurel Avenue "is a small street but then it like loops around to a cul-de-sac, [which] would be considered Laurel Place," and that he would characterize his location that day "as in the area of Laurel Avenue and Laurel Place."  1T 52:7-13; 174:23-175:1; *see also* Ex. 36A, Trenton Area Map.  Detective Maldonado acknowledged that the statement in the search warrant affidavit indicating that he was located on Laurel Avenue was an "error."  1T 175:13-19. The Court will discuss this issue in greater detail, *infra*.

the vehicle may have been another police car sent to conduct surveillance.   177:24-178:8.

Detective Maldonado relayed his observations to the rest of the surveillance team via their

communication app, Zello, and inquired whether the car was another member of the surveillance

team; he was informed that he was alone.   1T 179:2-181:7.  Shortly thereafter, Detective

Maldonado witnessed a shirtless African American male, later identified as Taquan Williams, exit

44 Laurel Place holding a yellow plastic bag, which appeared weighted down with rectangular

objects. 1T 179:4-5; 181:5-8.  Williams walked to the end of the porch and, according to Detective

Maldonado, Williams scanned the area nervously before approaching and entering the

Volkswagen Passat on the front passenger side.   1T 180:18-181:6; 185:14-24; 187:16-23.  At the

evidentiary hearing, Detective Maldonado testified that based on his training and experience, and

the shape of the bag, he believed the bag contained "multiple bricks of heroin."   1T 185:4-15.

Detective Maldonado conveyed his observations to the rest of the surveillance team, and Detective

Cox directed him to follow the vehicle.   1T 188:7-13; 52:4-54:25.  As the vehicle continued to

drive, Detective Maldonado was able to report the license plate of the Volkswagen Passat.  1T

188:1-2.  Detective Cox testified that, based on Detective Maldonado's description of the vehicle

and the license plate information, she was aware that the vehicle belonged to Wimbush and she

suspected that it was the same vehicle which was involved in the September 2, 2018 shooting.  1T

52:4-54:7.  Detective Cox directed a mobile arrest unit[7] to effectuate a motor vehicle stop of the

---

[7]      In connection with the Task Force's surveillance efforts, Detective Ramos testified that
mobile arrests units are police officers on standby in the general vicinity of the surveillance team.
1T 225:4-13; 230:11-19.  According to Detective Ramos, these officers wait until they "get the
go-ahead to move in, either effect an arrest, [or] conduct a motor vehicle stop." 1T 225:10-13;
230:11-19.  Detective Cox also explained that the mobile arrest units are necessary when officers
are conducting surveillance in undercover vehicles, which are not equipped with police sirens.  1T
51:7-14.  Furthermore, the use of mobile arrest units also protects the integrity of the undercover
vehicles. *Id*.

Volkswagen Passat. 1T 237:19-20.   Detective Cox testified that her reasons for directing the mobile arrest unit to stop the Passat were "Wimbush's criminal history, . . . his suspended [license] status, . . . the vehicle possibly being involved in a shooting, . . . the motor vehicle violations of the vehicle, . . . [the] confidential informant information, . . . the wiretap transmissions involving the possibility for a possible – future acts of violence." 1T 54:25-55:1-10.

Detectives Ramos and Bernstein, from the Trenton Police Department, were one of the two designated mobile arrests units stationed near where Detective Maldonado was conducting his surveillance, and at Detective Cox's direction, they reported to the scene.[8]   1T 228:7-10; 237:19-20.   Prior to effectuating the stop of the Passat, Ramos and Bernstein were receiving Detective Maldonado's description of his surveillance and observations via Zello.   1T 233:2-3.   Once they were ordered to stop the Volkswagen Passat, Detectives Ramos and Bernstein drove in the direction of the vehicle, using instructions conveyed to them by Detective Maldonado over Zello. 1T 234:12-16; 2T 56:15-57:2.   When the officers located the Volkswagen, which was pulled over on the side of Hoffman Avenue, they activated their police lights and approached the vehicle with their service weapons drawn. 1T 239:2-19; 236:20-25.   While approaching the vehicle, the detectives repeatedly issued verbal commands for the occupants of the vehicle to roll down their windows, to no avail.  1T 239:2-7.   Detective Ramos noticed that the Passat "was rocking as if the occupants inside [were] moving around."  1T 239:16-19.   Thereafter, Detective Ramos approached the passenger side of the vehicle and Detective Bernstein approached the driver's side of the vehicle. 1T 239:23-240:3. Both detectives reiterated their commands for the occupants to roll down the windows.  *Id*.  A few moments later, after the occupants complied, the officers discovered that

---

[8]      At the suppression hearing, Detective Ramos testified that he could not recall who was in the wiretap room giving instructions, but recalled receiving instructions from Detective Maldonado.  1T 228:1-6; 1T 229:15-17

there were four occupants in the vehicle, and immediately noted "[t]he strong odor of raw marijuana." 1T 240:2-25. Detective Ramos testified that "there was no doubt in [his] mind it was marijuana." 1T 240:23-241:2. The officers directed the occupants to show their hands. 1T 241:3-13. The driver, Wimbush, placed his hands on the steering wheel; the front passenger, Williams, placed his hands on the dashboard; and the rear passengers, West and a juvenile, both placed their hands on the headrest. *Id*.

At approximately 2:41 p.m., the detectives removed the occupants from the vehicle and conducted a patdown search of each occupant. 2T:58-6-22. Detective Bernstein conducted a patdown of Wimbush, which was uneventful, and then seated him on the curb near the rear of the vehicle. 1T 243:22-244:11. Detective Ramos conducted the patdown search of the remaining individuals, which were each uneventful, with the exception of West.[9] 1T 246:7-10. During the patdown search of West, Detective Ramos felt "a rectangular shaped object that [he] immediately recognized to be consistent with the size and shape of a brick of heroin" in West's right front pocket. 1T 247:11-17. Detective Ramos retrieved the object from West's pocket discovering one full brick of heroin, three bundles of heroin packaged in a brick wrapper, and one bag of marijuana. 1T 248:13-22; 250:1-21. West was immediately handcuffed and placed under arrest, and the remaining three occupants were detained pending further investigation. 1T 251:21-252:28. All four occupants were handcuffed and seated on the sidewalk near the rear of the vehicle. *Id*. During the process of removing the vehicle's occupants in order to conduct the patdowns, Detective Ramos "glanced at the floorboard, the driver's floorboard, and . . . immediately noticed grains of

---

[9]     Detective Ramos could not recall the specific order in which he conducted the patdowns of Williams, West, and the juvenile in the car. 1T 245:25-246:3.

rice, several grains of rice." 2T 51:5-13.  However, he did not see the yellow bag that Detective

Maldonado had observed Williams holding when he entered the vehicle.  2T 52:15-53:8

After discovering the heroin and marijuana in West's pocket, Detectives Ramos and

Bernstein called for patrol units to provide additional protection, uniformed police officers, and a

marked police unit, to the scene.  2T 53:9-54:15.  The patrol officers arrived on the scene at

approximately 2:45 p.m.  *See* Exs. 46-47, Body Worn Camera Videos.[10]  Once the patrol units

arrived, the officers collected biographical information from the occupants, and placed them in the

prisoner compartment of the marked police vehicle.  *Id.*

After the occupants were secured, the officers conducted a visual search of the interior of

the vehicle. Detective Ramos testified that the officers did not conduct "a full blown search," but

examined "floorboards, front and back, seats . . .  like the doors, just to see if they had pockets or

sometimes the handle is not all the way through, it has little pockets, you know, just looking to see

if we could find additional marijuana just laying around."  2T 74:9-16; 2T 52:1-14.  When

Detective Sergeant Ordille arrived on the scene, he was informed that West possessed heroin, and

that neither Detective Maldonado nor Ramos had been able to locate the yellow bag which

Williams was holding when he entered the vehicle.[11] 2T 208:13-209:7.  Detective Sergeant Ordille

---

[10]    While Officers Pion and Williams of the Trenton Police Department were equipped with
body-worn cameras, both officers inexplicably deactivated their cameras shortly after their arrival
on the scene.  Detective Ramos testified that neither he nor Detective Bernstein directed them to
do so, and he was unaware of why they decided to turn their cameras off.  2T 71:9-14.  The available
footage from both cameras was played at the suppression hearing.  *See* 2T 68:15-71:11; *see also*
Exs. 46,47 Body Worn Camera Footage

[11]    It is unclear at precisely what time Detective Sergeant Ordille arrived on the scene.
According to his suppression hearing testimony, he arrived after the patdown search of West, but
before the canine unit.  2T 208:13-19; 209:5-14.  The video from the body camera worn by the
patrol officers in the mobile arrest unit indicates that they arrived at 2:45 p.m., and upon their
arrival, Detective Ramos immediately informed them they were "waiting on the canine."  *See* Ex.

requested that one of the other officers call a K-9 unit to the scene.  2T 209:5-14.  At approximately 2:51 p.m., Sergeant Scott Kivet, a canine officer from the Robbinsville Police Department, arrived with Quori, a trained narcotics-sniffing canine. [12]   2T 151:5-15.  Once Quori  arrived on the scene, Sergeant Kivet walked through the procedure for conducting a vehicle sniff.   First, Quori conducted a sniff of the exterior of the car, then the interior of the car; Quori alerted to the presence of narcotics.  2T 76:5-9; 2T 158:1-8.  However, Quori had difficulty localizing the odor of the narcotics, and could not pinpoint the exact location of the narcotics in the vehicle.  2T 159:25-160:25.  Sergeant Kivet remained on the scene for a period of time after Quori's positive alert, but left before the officers on the scene located any narcotics. 2T 165:7-166:17.

After the positive canine sniff, Detective Sergeant Ordille, who had not observed the canine sniff, was advised by other officers that Quori had alerted to the odor of narcotics in the vehicle. Recalling the confidential informant's tip, Detective Sergeant Ordille began examining the rear seat of the Passat and noted that it appeared to have a hidden compartment.  2T 210:5-10. According to Detective Sergeant Ordille, who was an auto body technician prior to beginning his career in law enforcement, the lower part of the rear seat of Volkswagens are typically held in place by two plastic clips, and the seat lifts easily,  but the rear seat of Wimbush's vehicle "had a lot of resistance to it." 2T 210:12-18; 1T 188:22-189:1. However,  Detective Sergeant Ordille was able to lift up the "passenger side rear of [the vehicle] enough to be able to see inside of --

---

46 and 47.  Because Detective Sergeant Ordille testified that he decided to call a canine unit, he likely arrived shortly before the mobile arrest unit.  2T 208:13-19; 209:5-14.

[12]      The parties dispute the timing of Sergeant Kivet's arrival.   Defendants contend that Sergeant Kivet did not arrive at the scene until approximately 3:25pm, nearly 40 minutes after Defendants Wimbush and Williams were placed in patrol vehicles for investigative detention.  Def. Post-Hearing Br. at 33.

underneath the seat." 2T 210:15-18.  Underneath the seat he observed "[a] large void, as well as the yellow bag, the suspected yellow bag that Williams brought out of the house and got in the vehicle with, as well as what appeared to be a handgun and a rifle-style weapon." 2T 211:18-21. Detective Sergeant Ordille removed the yellow bag from the cavity, and discovered "[t]wo boxes of ammunition and three handgun magazines." 2T 212:24-213-5. The officers did not fully open the trap, or complete the search of the compartment, at that time.  At 3:53 p.m., one of the patrol officers on the scene notified Sergeant Kivet, via text message, that a bag and guns had been found under the vehicle's rear seat.  *See* Ex. 14, Text Message to Sergeant Scott Kivet, September 6, 2018.

According to Detective Sergeant Ordille, while the officers were searching the vehicle, police dispatch received two calls regarding "shots fired" in the nearby area, and as such, they decided that it "seemed more prudent to take [the vehicle] to a controlled location to be processed and photographed."  2T 214:12-18.  At approximately 3:58 p.m., the officers called a tow truck, which brought the vehicle to Trenton Police headquarters.  *See* Government Ex. 11.  Detective Sergeant Ordille drafted a search warrant affidavit and submitted it to a Deputy Attorney General who applied for the warrant before a state court judge. 2T 215:10-21.  No other officers reviewed the search warrant affidavit before it was submitted.  *Id*.  After the search warrant was issued, at approximately 9:50 p.m., Detective Sergeant Ordille and other officers, including Detectives Maldonado and Ramos, continued the search of the Volkswagen.  1T 191:3-8; 192:1-5; 2T 80:6-9.  Detective Maldonado searched the rear seat area of the vehicle and located the after-market wiring of the trap, which he cut.  1t 191:11-25.  After the wire was cut, the trap was reversed, and the rear seat of the vehicle lifted up, and revealed "[s]everal weapons, three handguns . . ., a rifle,

as well as a large quantity of heroin."  2T 219:4-8; *see also* Ex. 42, Photographs of Trap Compartment.

## II.    PROCEDURAL HISTORY

On August 8, 2019, a Grand Jury returned a fifteen-count second superseding indictment against various individuals, including Wimbush, Williams, and West, charging each defendant with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. § 846, possession with intent to distribute and/or distribution and possession with intent to distribute controlled dangerous substances in violation of 21 U.S.C. § 84, and possession of a firearm in furtherance of a drug trafficking crime in violation of 19 U.S.C. § 924(c)(1)(A).   Wimbush and Williams were also charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).

On September 14, 2019, Wimbush moved to suppress the evidence seized during the warrantless search of the Volkswagen Passat, the pat-down of the vehicle's occupants, and the evidence later recovered from the vehicle pursuant to the search warrant.  *See* ECF No. 363, 371. West and Williams joined in Wimbush's motion.  *See* ECF Nos. 368, 364.  The Government filed an omnibus opposition to the motions to suppress on November 1, 2019.  *See* ECF No. 365.

This Court held a two-day evidentiary hearing on January 14 and 16, 2020, during which the Court heard testimony from Detective Cox, Sergeant Maldonado, Detective Ramos, Sergeant Kivet, Detective Sergeant David Ordille, and Defendants' sole witness, an investigator, Joseph Wright.  Following the evidentiary hearing, the Court reserved decision on the motion and instructed the parties to submit post-hearing briefing in lieu of closing arguments.

## III.   DISCUSSION

Defendants challenge each phase of the events leading to the discovery of the guns and drugs, including the initial stop of the Volkswagen Passat, the patdown search of the occupants, and the search of the vehicle pursuant to the search warrant. Defendants contend that the September 6, 2018 motor vehicle stop was an illegal warrantless seizure, and that the subsequent pat down was an illegal search and no exception to the warrant requirement applies. Additionally, Defendants argue that to the extent the Court is inclined to find that the initial stop of the Volkswagen Passat was supported by probable cause, the Government was required to seek a search warrant for the vehicle, because the events giving rise to probable cause occurred in the days prior to September 6, 2018. Def. Post-Hearing Brief at 2. In Defendants' view, the Government's failure to obtain a search warrant prior to the motor vehicle stop renders the ensuing search invalid, regardless of whether the search was supported by probable cause. *Id*.

The Government argues that there are several constitutionally permissible justifications for the stop of the Volkswagen Passat and, at minimum, the initial stop of the vehicle was justifiable as a short, investigative detention, permitted without a warrant under *Terry v. Ohio*, 392 U.S. 1 (1968). Gov't Post-Hearing Br. at 56-58. Alternatively, the motor vehicle stop and search were both justified under the automobile exception because the events which occurred in the days leading up to the stop gave law enforcement probable cause to believe that evidence of a crime would be located in the vehicle. Gov't Post-Hearing Br. at 52-55.

Initially, the burden of proof is on the defendant who seeks to suppress evidence. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Id*. To sustain a warrantless search or seizure, the government must prove by a preponderance of the evidence that "each

14

individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). In deciding a motion to suppress, credibility determinations are within the purview of the trial judge. *United States v. Scarfo*, 180 F. Supp. 2d 572, 576 (D.N.J. 2001) ("In particular, credibility determinations are to be made in consideration of numerous factors, including the witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand and, ultimately, the extent to which the testimony withstands a common sense test of reason and logic."); *United States v. Graham*, No. 13-00626, 2014 WL 3396495, at *4 (D.N.J. July 9, 2014) ("on a motion to suppress evidence, it is the trial court that determines the credibility of witnesses"). Accordingly, the Court will sequentially examine each step of the motor vehicle stop, the issuance of the warrant, and the ensuing search, and address each of Defendants' arguments in turn.

### A.  The Purpose of the Law Enforcement Surveillance

As an initial matter, Defendants challenge the law enforcement officers' version of events, contending that the officers were not in the area of Laurel Avenue and Laurel Place in order to surveil Taques Hall or "Buddah," but rather, to pursue Timothy Wimbush. Def. Post-Hearing Br. Br. at 5-7. To that end, Defendants emphasize that in the days leading up to the search, law enforcement purportedly believed that 1) Wimbush's vehicle was utilized in the September 2, 2018 shooting; 2) Wimbush himself may have been involved in the September 2, 2018 shooting; and 3) that Wimbush's vehicle contained a trap compartment used to transport guns and weapons. Def. Post-Hearing Br. at 5-7. Thus, Defendants posit "it makes little sense that, at the peak of the investigation of Wimbush, in the aftermath of three separate shooting events, and with concerns of continued violence, law enforcement would abandon the pursuit of Wimbush in order to conduct a generalized surveillance of Tacques Hall." Def. Post-Hearing Br. at 6-7. Defendants highlight

15

various inconsistencies which they submit render the Government's version of events pretextual – that the officers stumbled upon Wimbush, West and Williams while engaging upon a surveillance of a different target. *id*. at 9-15.  Specifically, Defendants contend that  1) none of the surveillance reports from September 6, 2018,  document the alleged surveillance of Taques Hall, even though a surveillance of a different suspect earlier that day was documented, and further, there are no photographs of Hall's vehicle, Def. Post-Hearing Br. at 9-10; 2) law enforcement officers gave differing testimony regarding the precise reason why Taques Hall was under surveillance, Def. Post-Hearing Br. at 10-11; and 3) Detective Maldonado was allegedly positioned on Laurel Place in order to observe Hall's vehicle, which was purportedly parked on Volk Street, however, Joseph Wright, the defense team's investigator, testified that there are "no parking" signs on Volk Street, Def. Post-Hearing Br. at 14-15.

Moreover, Defendants argue that to the extent law enforcement officers were engaged in a targeted investigation of Wimbush, they had the requisite probable cause and the time to obtain a search warrant, prior to the motor vehicle stop on September 6, 2018.  Def. Post-Hearing Br. at 27. Defendants contend that the Government was required to do so, and cannot rely on an exception to the warrant requirement to justify the initial stop.  *Id*.

The Government concedes that "[t]here is no question that the officers' documentation fell short of best practices in certain respects" and "clearly the documentation could have been better." Gov't  Post-Hearing Br. at 7-8. The Court agrees.   While the discrepancies identified by Defendants are certainly concerning, I find that the specific credibility issues raised, and there are several, do not nonetheless undermine the officers' credibility regarding the material facts underlying this suppression motion.  *See Graham*, 2014 WL 3396495 at *4 (noting that credibility determinations should consider, among other factors, "the extent to which the testimony

withstands a common sense test of reason and logic" (internal citations and quotation marks omitted)).  None of the identified inconsistencies suggest that the officers' testimony regarding the critical facts underlying the stop of Wimbush's Volkswagen Passat, or the subsequent search, were fabricated or incredible.  Thus, I will not discredit the Government's version of events on that basis.  However, to the extent any of the specific credibility issues Defendants have identified impact the Court's findings on other specific factual issues, they will be discussed in further detail, *infra*.

Moreover, regardless of *why* Detective Maldonado was conducting surveillance outside of Laurel Place on September 6, 2018, it is clear to the Court that he accurately portrayed the persons, places, and things that he claimed to have observed.  Among the discrepancies identified by Defendants the Court will address one, in particular, because it bears heavily on the legitimacy of all of the attendant events: Detective Maldonado's location at the time he observed Taquan Williams. Detective Maldonado testified that he observed Williams walk out of 44 Laurel ***Place*** and walk toward 52 Laurel ***Place*** with a yellow plastic bag, which appeared weighted down with rectangular objects.  1T 179:4-5; 181:5-8**.**  Consistent with Detective Maldonado's testimony, Detective Cox testified that "Detective Maldonado related to me that . . . . He observed a male exit a residence on Laurel ***Place***." 1T 53:2-6; 105:1-2.  However, the search warrant affidavit and the police report, both of which were drafted by Detective Sergeant Ordille, indicate that Williams walked out of 44 Laurel ***Avenue***, toward 52 Laurel ***Avenue***.  *See* Gov. Ex, 8 Trenton Police Department Investigation Report, Sept. 6, 2018; Gov. Ex. 9, Search Warrant Materials. Furthermore, both Detective Sergeant Ordille and Detective Ramos testified that they heard Detective Maldonado say, over Zello, that he was on Laurel Avenue and saw Williams leaving an address on Laurel Avenue. 2T 206:17-207:2; 231:17-19.

17

Detective Cox portrayed the discrepancy as a "typo" in the search warrant affidavit, 1T 103:23; 149:12-15, while Detective Maldonado characterized it as an "error," 1T 175:13-19. None of the testifying offers proffered any adequate explanation for how or why the mistake was made, but it is clear that Detective Maldonado was located, as he testified, on Laurel Place, facing Volk Street.  Detective Maldonado proffered a clear and precise explanation for why he purportedly chose to park on Laurel Place facing Volk Street: "Volk Street is a one-way. Laurel Avenue is a one-way. In order to get to Laurel Avenue, you have to go through Highland, make the left on Volk, make a left on Laurel Avenue. So [he] positioned [him]self at the best position to observe the vehicle," 2T 38: 9-13. He also testified, in painstaking detail, as to his initial observations of the Volkswagen Passat: he observed it drive up Volk Street, turn right up Laurel Avenue, left onto Laurel Place and park directly behind him. 1T 176:21-177:9 Furthermore, as evidenced by Detectives Ramos and Maldonado's ability to apprehend the Volkswagen Passat, it is clear that Maldonado was in a position to observe the vehicle and relay its movements to the other officers. Critically, there is no dispute regarding the substance of what Detective Maldonado observed; his testimony regarding his observations of Williams that day were both detailed and cogent and the Court will credit his testimony, in that regard**.** Accordingly, the focus of the Court's inquiry is not where or why Detective Maldonado was in the area of Laurel Avenue and Laurel Place, but whether his observations, and the other information known to law enforcement, justified the initial stop of the Volkswagen Passat, and whether the ensuing patdown search of the vehicle's occupants and the search of the vehicle, itself, were proper. [13]

---

[13]     The Government proffers various arguments intended to diffuse other identified factual discrepancies, and support its position that the officers' testimony was largely credible.  The Government contends that 1) the surveillance logs do not identify Taques Hall as the target of Detective Maldonado's surveillance because the officers never saw the target and the initial purpose of the surveillance was "eclipsed" by the subsequent vehicle stop; Gov't. Post-Hearing

Even if, as Defendants contend, the initial stop of the Volkswagen Passat was part and parcel of an investigation focused on Wimbush and the Government had sufficient probable cause to seek a warrant prior to September 6, 2018, the Government was not required to do so. Defendants rely solely on *Johnson v. United States*, 333 U.S. 10 (1948) to support their argument that, regardless of whether there was probable cause for the initial stop, the Government is precluded from relying on any exceptions to the warrant requirement. Def. Post-Hearing Br. at 27. In *Johnson*, the police received a tip that individuals were smoking opium in a hotel room. 333 U.S. at 12. When they arrived at the hotel to investigate, the police smelled the "distinctive and unmistakable" odor of burning opium coming from a certain room. *Id.* at 15. They knocked on the door, identified themselves as police officers and asked to enter the room in order to talk to the occupants. *Id.* Once they entered, the police proceeded to search the room, discovering evidence of drugs. *Id.* The Supreme Court concluded that the search violated the Fourth Amendment because the government offered no reason "for not obtaining a search warrant except the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate." *Id.* However, *Johnson* does not stand for a general proposition that

---

Br. at 21; 2) although their testimony regarding why they chose that specific location differed, Detectives Cox and Maldonado both testified that the general purpose of the surveillance in the area of Laurel Place and Laurel Avenue was to identify "Buddah," the street name for Taques Hall, *id*. at 20; and 3) the defense investigator's observations of Volk Street in 2020 have "no bearing on what Detective Maldonado saw on Volk Street from his position on September 6, 2018," *id*. at 23 n.9. In light of the Government's concession that the officers' paperwork was far from accurate, I will not address each of these arguments individually. Because I find the officers' testimony regarding the Task Force's purpose in conducting the surveillance that day to be immaterial to the Fourth Amendment analysis, I need not address these factual discrepancies. I note, however, that the record before me suggests that law enforcement's approach to documenting this investigation was careless and at times, purposely false. Although the haphazard documentation itself does not rise to the level of a constitutional violation in this instance, these practices are not merely "typos" or "errors," and thus, I caution that such "mistakes" in other circumstances may jeopardize future investigations and prosecutions.

law enforcement must seek a warrant in every circumstance where they have the opportunity to do so; rather, the Court specifically addressed when law enforcement officers may avail themselves of the exigent circumstances exception to the warrant requirement.  Critically, the *Johnson* Court recognized that under certain circumstances, a warrant is unnecessary.  *Id*. (noting that "[n]o suspect was fleeing or likely to take flight.  The search was of permanent premises, not of a movable vehicle.  No evidence or contraband was threatened with removal or destruction.").  Furthermore, in *Kentucky v. King*, 563 U.S. 452, 467 (2011), the Supreme Court rejected the notion that simply because law enforcement may have probable cause to seek a warrant, officers are required to do so.  *Id*.  ("Faulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is nowhere to be found in the Constitution.").  The Supreme Court identified various reasons why officers might not seek a search warrant immediately, explaining

> law enforcement officers may wish to obtain more evidence before submitting what might otherwise be considered a marginal warrant application. . . . [P]rosecutors may wish to wait until they acquire evidence that can justify a search that is broader in scope than the search that a judicial officer is likely to authorize based on the evidence then available. And finally, in many cases, law enforcement may not want to execute a search that will disclose the existence of an investigation because doing so may interfere with the acquisition of additional evidence against those already under suspicion or evidence about additional but as yet unknown participants in a criminal scheme.

*Id*.  Accordingly, Defendants' contention that the Government's failure to seek a search warrant precludes the application of any exceptions to warrant requirement is unavailing.

### B.  The Stop of the Volkswagen Passat and the Patdown Search of the Vehicle's Occupants

The Fourth Amendment protects the public against "unreasonable searches and seizures." U.S. Const. amend. IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002) (citation omitted). Warrantless searches and seizures are *per se* unreasonable subject only to a few specifically established and well delineated exceptions. *Horton v. California,* 496 U.S. 128, 133 (1990). Under one exception, law enforcement officers may conduct "a brief, investigatory stop," known as a *Terry* stop, upon a showing of less than probable cause. *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012). Under *Terry*'s "well-established exception to the Fourth Amendment's warrant requirement," an officer may conduct a *Terry* stop, so long as the officer "'has a reasonable, articulable suspicion that criminal activity is afoot.'" *Lewis*, 672 F.3d at 237 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Although *Terry* dealt with the stop and frisk of individuals, it "applies with equal force to a traffic stop of a vehicle." *Id.* As part of the *Terry* stop of an automobile, an officer may also conduct a patdown search of a vehicle's occupants, so long as he has reasonable suspicion that the occupants may be armed or dangerous. *United States v. Bonner,* 363 F.3d 213, 216 (3d Cir. 2004).

Furthermore, another exception, the automobile exception, permits vehicle searches without a warrant if there is "probable cause to believe that the vehicle contains evidence of a crime." *United States v. Donahue*, 764 F.3d 293, 299-300 (3d Cir. 2014) (internal quotation marks and citations omitted). The Third Circuit has recognized the "broad sweep of the automobile exception," pursuant to which a vehicle may be searched without a warrant upon a showing of probable cause that evidence of a crime may be located in the vehicle. *Id.* at 300. Any evidence obtained pursuant to a search that does not meet a recognized exception to the warrant requirement

must be suppressed as "fruit of the poisonous tree." *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).

Here, there is no dispute that Defendants were "seized" for purposes of the Fourth Amendment, when the law enforcement officers pulled the Volkswagen Passat over on Hoffman Avenue. *See United States v. Boxley*, No. 17-177, 2019 WL 6828393, at *6 (W.D. Pa. Dec. 13, 2019) (explaining that "seizure" of moving vehicle occurs when the "vehicle comes to a complete stop and submits to the authority of the police."). Because the seizure was effectuated without a warrant, it is the Government's burden to demonstrate that the seizure falls within the scope of the exceptions upon which they rely: the *Terry* stop and frisk or automobile exceptions to the warrant requirement. *Johnson*, 63 F.3d at 245. First, the Court will assess whether the motor vehicle stop fell within the bounds of a permissible *Terry* stop.

### i.    Reasonable Suspicion

The lawfulness of a *Terry* stop under the Fourth Amendment requires a dual analysis: first, the court "examine[s] 'whether the officer's action was justified at its inception'—that is, whether the stop was supported by reasonable suspicion at the outset"; second, the court "determine[s] whether the manner in which the stop was conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Johnson,* 592 F.3d 442, 451 (3d Cir. 2010) (quoting *Terry*, 392 U.S. at 19–20). "To meet the reasonable suspicion standard, an officer needs only 'a minimal level of objective justification.'" *United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018) (quoting *Wardlow*, 528 U.S. at 123). In examining this question, a court must consider only the facts known to the officer at the time of the stop. *See United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015). "The test is one of reasonableness given the totality of the circumstances, which can include [the suspect's] location,

a history of crime in the area, [the suspect's] nervous behavior and evasiveness, and [the officer's] 'commonsense judgments and inferences about human behavior.'" *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) (quoting *Wardlow*, 528 U.S. at 124–25; *see also United States v. Fogle*, 515 F. Supp. 2d 474, 484 (D.N.J. 2007) (explaining that "a wide range of factors" are relevant to *Terry*'s totality of the circumstances analysis, including, the reputation of the area in which the stop occurred for criminal activity; the geographical and temporal proximity of the stop to the scene of an alleged crime; and the behavior of defendant when police came into his vicinity, even if lawful conduct).

### 1.  Driving while Suspended

Detective Cox testified that one of the reasons why she ordered the stop of the Volkswagen Passat on September 6, 2018, was because she was purportedly aware of Wimbush's "suspended [driver] status." 1T 54:1-2; 160:17-18. On April 6, 2020, the Government filed a supplemental letter-brief, notifying this Court of the Supreme Court's recent decision in *Kansas v. Glover*, wherein the Supreme Court held that "police officers who know only that the registered owner of a vehicle has a suspended license may make a *Terry* stop of the vehicle, so long as they 'lack[] information negating an inference that the owner is the driver of the vehicle." *See* ECF No. 477, Letter Notifying the Court of Supplemental Authority.

In *Glover*, an officer on routine patrol duty observed an individual operating a 1995 Chevrolet 1500 pickup truck with a Kansas license plate 295ATJ. *Kansas v. Glover*, ___ U.S. ___ (April 6, 2020) (slip op. at 1-2). When he ran the license plate he discovered that the registered owner of the truck was a Charles Glover, Jr. and that Mr. Glover's driver's license was revoked. *Id*. at 2. The officer stopped the truck, which was, in fact, being driver by Glover. The Supreme Court reversed the suppression of the evidence from the stop, explaining that from the facts

available to him, the officer "drew the commonsense inference that Glover was likely the driver of the vehicle, which provided more than reasonable suspicion to initiate the stop." *Id*. at 4. In upholding the officer's inference that Glover was driving while his license was revoked, the Court noted that he "possessed no exculpatory information—let alone sufficient information to rebut the reasonable inference that Glover was driving his own truck—and thus the stop was justified." *Id*. at 9.

While the status of Wimbush's driver's license was the subject of much dispute by the parties, it is not clear to the Court that Wimbush's New Jersey Driver's License was suspended, and thus, it is not readily apparent whether the Supreme Court's decision in *Kansas v. Glover* is applicable to the instant facts. In his pre-hearing brief, Wimbush noted that despite law enforcement's belief that he was a suspended driver, his "New Jersey Driver's license was not suspended according to his New Jersey Driving Abstract. It is Wimbush's Pennsylvania Driver's license, and not his [New Jersey] license [that] was suspended. Given that all reports refer to Wimbush's New Jersey license as being suspended, when it was not, it does not appear that law enforcement had probable cause to pull Wimbush over for that reason." ECF No. 363, Wimbush Pre-Hearing Br. at 21.

In response, the Government, relying on N.J.S.A 39:3-40, argued in its pre-hearing brief, that "[b]ecause New Jersey and Pennsylvania are parties to the multi-state Driver's License Compact, Wimbush was subject to New Jersey's reciprocity laws, and thus was a suspended driver in New Jersey due to his suspended Pennsylvania license." ECF No. 385, Gov't Br. at 8. However, on the record at the suppression hearing, the Government conceded that "the language of the statute discusses out-of-state drivers," but nonetheless, maintained that "there are also statutes and regulations which the Government could argue and will represent [that they] prevent

24

one from having two licenses in different jurisdictions . . . . So, the fact that Mr. Wimbush had

both licenses, having the out-of-state license being invalidated, would still . . . invalidate his ability

to drive in New Jersey." 2T 275:3-11. Despite that proffer, the Government has not cited any

statute or case law in that regard, nor has it adduced any documentary evidence indicating that

Wimbush's New Jersey driving privileges were, in fact, suspended or invalidated.

 N.J.S.A. 39:3-40 provides in relevant part:

> No person to whom a driver's license has been refused or
> whose driver's license or reciprocity privilege has been
> suspended or revoked, or who has been prohibited from
> obtaining a driver's license, shall personally operate a motor
> vehicle during the period of refusal, suspension, revocation,
> or prohibition

       As defense counsel correctly noted, and the Government conceded on the record, under

N.J.S.A. 39:3-40 if a non-resident's driver's license has been suspended or revoked in his or her

home state, his or her reciprocity privileges will be considered to have been automatically

suspended in New Jersey. *See State v. Profita*, 183 N.J. Super. 425, 429, 444 A.2d 70, 72 (App.

Div. 1982) (explaining that "N.J.S.A. 39:3-40 applies to any resident and nonresident motorist

whose driver's license has been suspended or revoked and to a nonresident motorist whose

privilege to drive a motor vehicle in this State has been automatically suspended as a consequence

of the suspension of his foreign driver's license, as well as to nonresidents whose reciprocity

privilege has been suspended in this State by proceedings under N.J.S.A. 39:5-30."). In other

words, an-out of-state motorist operating a motor vehicle in New Jersey while his driver's license

has been suspended or revoked in his home state is a suspended driver and would be in violation

of New Jersey's motor vehicle laws. *Id*. Here, however, Wimbush appears to have been a New

Jersey resident, and as indicated by the police report from the motor vehicle stop on September

4th, he possessed a New Jersey driver's license and provided a New Jersey home address.  *See* Gov't. Ex. 5, Trenton Police Contact Report, September 4, 2018.

Because Wimbush is a New Jersey resident and possessed a New Jersey driver's license, he need not rely on the reciprocity privilege in order to drive in New Jersey and it does not appear that the suspension of his Pennsylvania license and the revocation of "reciprocity privileges," under N.J.S.A 39:3-40 would automatically render him a suspended driver in New Jersey. Although the Government has proffered a copy of Wimbush's Pennsylvania driver's abstract, the record does not contain a New Jersey driver's abstract, or any documentation from the New Jersey Motor Vehicle Commission about the status of Wimbush's New Jersey driving privileges.  Thus, the record currently before this Court does not include sufficient information about the status of Wimbush's New Jersey driver's license such that the Court can assess the application of *Glover* to the facts here.

### 2. Narcotics Possession

Nonetheless**,** I find that the totality of the circumstances supports a finding that the law enforcement officers had reasonable suspicion that the Volkswagen Passat and its occupants were engaged in criminal activity, specifically narcotics possession, at the time the traffic stop was initiated.  Detective Maldonado, an experienced narcotics officer, observed Williams exit 44 Laurel Place carrying a yellow bag purportedly containing rectangular bricks, which he opined, were consistent with the shape and size of multiple bricks of heroin.  As Williams crossed the street, Detective Maldonado observed him hesitantly scanning the area, before entering the vehicle with heavily tinted windows.  I find that those observations give rise to reasonable suspicion.  *See Wardlow*, 528 U.S. at 124 ("nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); *United States v. West*, 103 F. App'x 460, 462 (3d Cir. 2004) (explaining

that nervousness is not necessarily enough to establish reasonable suspicion but concluding that nervous behavior accompanied by other conduct could establish reasonable suspicion); *United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000) (finding that nervous behavior contributed to reasonable suspicion); *see also United States v. Garcia,* 339 F.3d 116, 119 (2d Cir. 2003) (affirming district court's finding that reasonable suspicion existed where officers observed, *inter alia*, defendants leaving a building "laden with a plastic bag containing a rectangular package" and engaging in "what appeared to be counter-surveillance"); *United States v. Fierros*, 12-150, 2012 WL 2401761, at *2 (D. Ariz. Apr. 30, 2012), *report and recommendation adopted*, 12-150, 2012 WL 2401758 (D. Ariz. June 26, 2012) (finding reasonable suspicion where officer observed "rectangular bundles covered with a blanket in a truck's rear cab," and officer had seen similar bundles containing narcotics during prior stops).  Furthermore, the officers had information from Detective Cox that days earlier two violent shootings had recently occurred in the area, and the Volkswagen Passat may have been involved in the September 2, 2018 shooting.  Thus, law enforcement had "a reasonable, articulable suspicion" that the Volkswagen Passat was engaged in criminal activity consisting of both narcotics activity and the earlier shooting.  *Lewis*, 672 F.3d at 237.

Defendants challenge that Detective Maldonado's observations of Williams could provide a sufficient basis for the *Terry* stop, because "[a]s Detective Maldonado agreed, most people have grocery bags in their homes, and people use bags to carry things."  Def. Post-Hearing Br. at 37. Defendants similarly dispute Detective Maldonado's observation that Williams was "scanning" the area nervously prior to crossing the street, by contending that, "Williams was being picked up, and would obviously need to look around to see where the car was that was picking him up, and given that there had been numerous shootings in the area and it being a high crime area, this, at

the time unknown black male had every right to be as concerned and alert to criminal activity as anyone else." Def. Br. at 37.

Defendants' arguments in this regard are unavailing. While there may have been legitimate alternate explanations for Williams' behavior, reasonable suspicion may be "'based on acts capable of innocent explanation.'" *United States v. Whitfield*, 634 F.3d 741, 744 (3d Cir. 2010) (quoting *United States v. Valentine*, 232 F.3d 350, 356 (3d Cir. 2000)); *see also United States v. Graves*, 877 F.3d 494, 499 (3d Cir. 2017) (explaining that courts grant "considerable deference to police officers' determinations of reasonable suspicion given their own experience and deductions about the cumulative information available to them that might well elude an untrained person"). Indeed, Detective Maldonado testified that he had twelve years of experience as a law enforcement officer, and that he attended classes on narcotics packaging and transportation. 1T 163:5-23. Based on that experience, the Court credits Detective Maldonado's testimony that he believed the yellow bag in Williams' possession contained bricks of heroin, irrespective of the fact that Detective Maldonado's belief was later proven to be untrue. *Johnson*, 332 F.3d at 207 (explaining that "[t]he Supreme Court has upheld a number of stops based on an officer's observation of entirely legal acts, where the acts, when viewed through the lens of a police officer's experience and combined with other circumstances, led to an articulable belief that a crime was about to be committed."); *see United States v. Gonzalez*, 630 F. App'x 157, 161 (3d Cir. 2015) (finding suspect's conduct justified *Terry* stop although there was "nothing inherently illegal about greeting someone on the street and exchanging money" because such conduct, when viewed from the perspective of a veteran narcotics officer, supports "a reasonable, individualized suspicion that the person receiving the money was engaged in criminal activity"). Thus, Defendants' proffer of an

alternate, non-suspicious basis for William's behavior does not obviate the existence of reasonable suspicion.

Furthermore, although Detective Maldonado was not the officer who effectuated the traffic stop, his knowledge may be properly imputed to Detectives Ramos and Bernstein – the officers who conducted the stop -- under the "collective knowledge doctrine." "The collective knowledge doctrine allows imputation of one law enforcement officer's knowledge to another officer who actually makes a stop, even if the latter did not directly observe the events giving rise to reasonable suspicion." *Gonzalez*, 630 F. App'x at 162 (finding that reasonable suspicion was properly imputed to the officer who conducted a *Terry* stop, where undercover officer described possible narcotics activity and conveyed the color, make, and model of the car and description of suspect's race, gender, and clothing, even though the undercover officer did not communicate "every" fact relevant to the reasonable suspicion analysis). Under this rule, determinations concerning the existence of reasonable suspicion can be made based on the knowledge of the officer conveying the information, not on "whether those relying on the [information] were themselves aware of the specific facts which led their colleagues to seek their assistance." *United States v. Hensley*, 469 U.S. 221, 231 (1985). Here, Detective Maldonado's observations were conveyed to the rest of the surveillance team, including Detective Cox, who made the decision to stop the vehicle, and the officers in the mobile arrest unit, who actually effectuated the stop. Accordingly, reasonable suspicion can properly be imputed to Detectives Ramos and Bernstein.

### 3.  The Violation of the New Jersey Motor Vehicle Code

There exists another independent basis justifying the stop of the  Volkswagen Passat on September 6, 2018: the vehicle's heavily tinted windows.  "A police officer who observes a violation of state traffic laws may lawfully stop the car committing the violation." *Bonner*, 363

29

F.3d at 216 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)); *see also United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) ("the Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime."); *Lewis*, 672 F.3d at 237-38 (explaining that law enforcement may use the observation of a traffic violation as a pretext for the investigation of another crime so long as the officer observed the traffic violation *prior* to initiating the traffic stop, and the traffic violation is not an *ex post facto* justification for the stop). "Traffic stops are classified as a type of *Terry* stop, and may be initiated based on a reasonable suspicion that a traffic violation has occurred." *United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018) (citing *Navarette v. California*, 572 U.S. 393, 401 (2014)).

Much like an officer may expand beyond the scope of a general *Terry* stop based on circumstances that develop during the scope of the stop, "[a]fter a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) (finding that state trooper was justified in extending traffic stop where officer received inconsistent and conflicting stories about drivers' travel destination).

Here, Defendants do not dispute that the windows of the Volkswagen Passat's were heavily tinted, and that Detective Maldonado made such an observation and conveyed that information to the rest of the surveillance team. Thus, the law enforcement officers were justified in stopping the vehicle to investigate the potential violation of the New Jersey Motor Vehicle Code.[14] *United*

---

[14]    N.J.S.A. § 39:3-75  provides that "no person shall drive any motor vehicle equipped with safety glazing material which causes undue or unsafe distortion of visibility or equipped with unduly fractured, discolored or deteriorated safety glazing material . . . ."

*States v. Cherisme*, No. 17-431, 2018 WL 6258880, at *3 (D.N.J. Nov. 29, 2018) (denying suppression motion because "the officers' observation of the car's darkly tinted windows constituted a reasonable and articulable suspicion that Defendant was in violation of N.J.S.A. 39:3-75, which provides a lawful basis for the stop"). Regardless of whether there was any additional underlying motive for stopping the car, the officers were permitted to conduct a motor vehicle stop based on the reasonable, articulable belief that the Passat's tinted windows were in violation of the relevant motor vehicle laws.

### C. Scope and Duration of the Detention

Though a *Terry* stop may be lawful at its inception, it can become "unreasonable," in either its scope or duration, at some later time, giving rise to a constitutional violation. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *see also Green,* 897 F.3d at 179-180 (explaining that in analyzing the constitutionality of a canine sniff, the relevant questions are whether the stop was unreasonably extended, when the extension occurred, and whether, at that moment, law enforcement possessed reasonable suspicion in order to justify the extension).

The scope of a *Terry* stop must be limited and must involve the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *See Florida v. Royer,* 460 U.S. 491, 500 (1983) ("In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects. Nor may the police seek to verify their suspicions by means that approach the conditions of arrest."). When evaluating whether a *Terry* stop is minimally intrusive, courts consider the duration of the stop, the purpose justifying the stop, whether the police diligently sought to carry out those purposes given the circumstances, and the alternative means

that the police could have used to achieve their end. *United States v. Leal*, 235 F. App'x 937, 941 (3d Cir. 2007). A protective pat down frisk of a vehicle's occupants falls within the bounds of a *Terry* stop, if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Moorefield*, 111 F.3d 10, 13-14 (3d Cir. 1997); *Johnson*, 555 U.S. at 326 (a *Terry* frisk is permissible where an officer "reasonably suspect[s] that the person stopped is armed and dangerous"). Police officers "may seize contraband detected during the lawful execution of a *Terry* search." *Minnesota v. Dickerson*, 508 U.S. 366, 374 (1993).

### i.   The Scope of the Patdown Search

Defendants challenge the patdown search of Jubri West, contending that Detective Ramos exceeded the bounds of a *Terry* patdown.[15] In that regard, Defendants question Detective Ramos's testimony that his hand got "stuck" on the brick of heroin, noting that heroin is a small drug, and the dimensions of the brick at issue were approximately an inch-and-a-half by half-an-inch.[16] Def. Post Hearing Br. at 26.

---

[15]   Defendants do not appear to challenge the officers' decision to conduct a pat down search, merely the manner in which it was conducted.

[16]   Defendants also challenge Detective Ramos's credibility, noting that during a 2004 internal affairs investigation, Detective Ramos was required to undergo a psychological evaluation, and one of the two psychologists who conducted the evaluation opined that he had been untruthful during his evaluation. Def. Post-Hearing Br. at 27. In light of the age of the internal affairs proceeding, and the minimal relevance to the instant matter, the Court does not find that the psychologists' opinion bears on Detective Ramos's credibility in this matter. The Court finds Detective Ramos's testimony regarding the patdown credible and will, thus, credit his testimony. In a similar vein, Defendants also raise credibility concerns regarding Detective Bernstein, Detective Ramos's partner and one of the law enforcement officers who conducted the motor vehicle and patdown searches. *See* Wimbush Pre-Hearing Br. at 21 n. 10; *see* Def. Post-Hearing Br. at 24 n.2. Defendants assert that following a suppression hearing in an unrelated state court criminal proceeding, Detective Bernstein's testimony was found not to be credible and he was one of five officers involved in a civil matter where those five officers collectively had an approximate 140 internal affairs complaints lodged against them. Def. Post-Hearing Br. at 24 n.2. Here,

Under the "plain feel" doctrine, an officer may seize contraband during a patdown search, "if its incriminating character is immediately apparent." *Dickerson*, 508 U.S. at 374-75. The relevant analysis for plain feel in the context of a patdown search, "is not the immediacy and certainty with which an officer knows an object to be contraband or the amount of manipulation required to acquire that knowledge, but rather what the officer believes the object is by the time he concludes that it is not a weapon." *United States v. Yamba*, 506 F.3d 251, 258 (3d Cir. 2007). Consistent with the purpose and rationale of Terry, an officer "is allowed to slide or manipulate an object in a suspect's pocket, consistent with a routine frisk, until the officer is able reasonably to eliminate the possibility that the object is a weapon." *Id*. at 259. If the officer believes the object is contraband before determining it is not a weapon, the officer can conduct a more intrusive search and ultimately seize the contraband, if any is found. *Id*.

Here, Detective Ramos testified that during a protective patdown, he utilizes the following procedure: "I start up here by the neck and rub down their chest and their stomach and I work around the front area, the waistband. After that, I go underneath the armpits, above if they have a long shirt. If they don't have a long-sleeve shirt, I don't waste my time with their arms. I go down the side of their leg, the inside of their legs and the back of their waistband area." 1T 244:16-245:10. During the patdown of West, Detective Ramos complied with his usual procedure, "and when [he] ran [his] hand down the right side of [West's] leg, in [West's] right front pocket, that's where [the Detective] felt the rectangular-shaped object that [he] immediately recognized to be

---

Detective Bernstein did not testify at the suppression hearing, and the Court was not able to independently assess his credibility. Furthermore, in light of the generally consistent testimony from the other law enforcement witnesses present on the scene during the motor vehicle stop, the Court does not find it necessary to make a finding regarding Detective Bernstein's credibility, which I cannot do in any event.

consistent with the size and shape of a brick of heroin." 1T 247:11-17. Once he retrieved the object from West's pocket, Detective Ramos found one full brick and a partial brick of heroin, and a bag of marijuana. 1T 248:13-17.

As described, the Court finds that the patdown was conducted in a reasonable manner, consistent with the Fourth Amendment. Because Detective Ramos immediately identified the object in West's pocket as contraband – a brick of heroin – it falls within the scope of the "plain feel" exception. *See United States v. Johnson*, 452 F. App'x 219, 226 (3d Cir. 2011) (affirming denial of suppression motion where officer "had probable cause to believe the object he felt in Johnson's pocket was contraband at the same moment or before he determined it was not a weapon"); *United States v. Cole*, No. 17- 284, 2019 WL 6330302, at *18 (W.D. Pa. Nov. 26, 2019) (finding that officer did not exceed the lawful scope of the patdown search where, during the course of a protective patdown, he discovered an object he "instantly" knew was heroin, giving rise to probable cause to conduct a more intrusive search to confirm his finding).

### ii.    The Canine Sniff and the Duration of the Stop

Defendants Wimbush and Williams contend that the duration of the stop was unreasonably extended because, while awaiting the canine officer, Wimbush and Williams -- who were not under arrest unlike West -- were detained for longer than reasonably permitted for a *Terry* stop.[17] Def. Post-Hearing Br. at 29-32. Defendants contend that Sergeant Kivet and Quori, the canine, did not arrive on the scene until approximately 3:25 p.m**.** Def. Post-Hearing Br. at 33. In support of that contention, Defendants largely rely on a statement from Officer Pion.[18] *See* Wimbush Ex. 12,

---

[17]     Defendants do not challenge the manner or accuracy of the canine sniff, merely the duration of the detention while awaiting the canine officer's arrival.

[18]     Officer Pion was unavailable to testify at the suppression hearing; however, he provided a verbal statement to the Government on October 8, 2019, which was summarized by the

Statement from Officer Melvin Pion.  Officer Pion recalled that Sergeant Kivet and Quori arrived on the scene approximately 40 minutes after him, and they remained there for "roughly an hour." *Id.*; *see also* 2T 283:19-23.  Because the video footage from Officer Pion's body-worn camera indicates that Officers Pion and Ramos arrived at approximately 2:45 p.m., Defendants posit that Sergeant Kivet must have arrived at approximately 3:25.  Defendants also note that the Mercer County Sheriff's Office Computer Assisted Dispatch Report states that at 3:48 the "Robbinsville K-9 is cleared and still standing by" indicating that Sergeant Kivet was still on the scene at that time.  *See* Gov't Ex. 15, Mercer County Sheriff's Office "CAD" Report.

In response, the Government contends that Sergeant Kivet arrived approximately 10-15 minutes after the stop began, at 2:51 p.m.[19]  Def. Br. at 40.  Consistent with the Government's proffered timeframe, Sergeant Kivet testified that he and Quori arrived at approximately 2:51 p.m., and to the best of his recollection he was on the scene for approximately 20 minutes.  2T 153:7-18; 171:19-23.  Sergeant Kivet's police report also indicates that the canine sniff occurred between 2:51 p.m. and 3:00 p.m.[20]  That time frame is consistent with the Robbinsville Computer Aided Dispatch Report "CAD" which indicates that Sergent Kivet arrived on the scene 2:52.[21]  *See* Ex.

---

Government and documented in a contact report. The contact report was admitted into evidence at the suppression hearing.  *See* Wimbush Ex. 12.

[19]     It is unclear precisely when Detectives Ramos and Bernstein initiated the stop of the Volkswagen Passat, however, Detective Ramos testified that he called in to dispatch at 2:41 p.m., when they arrived on the scene and after he and Detective Bernstein removed Defendants from the vehicle.  *See* 2T 57: 22-58:23.  The corresponding dispatch report also indicates that Detectives Bernstein and Ramos arrived at 2:41 p.m.  Detective Ramos further testified that they must have stopped the vehicle "a few moments before that."  2T:58:17-23.

[20]     Sergeant Kivet's Report indicates the "Time in Service" and "Time Out Service" which only reflects the time the canine unit, Quori, was actively engaged in its search.  *See* Gov't. Ex. 13, Robbinsville Township Police Report.

[21]     The Robbinsville Computer Aided Dispatch Report "CAD" is inconsistent with Sergeant Kivet's testimony regarding the length of time he was present on the scene.  The CAD indicates

48, Robbinsville Township CAD Report; *see* Gov. Ex. 13 Robbinsville Township Police Report, September 6, 2018.

I find that law enforcement did not unreasonably prolong the stop by obtaining the canine dog because the officers had, at minimum, reasonable suspicion of drug possession and at most, law enforcement waited approximately 40 minutes for the canine officer to arrive on the scene.

Here, the very purpose of the stop was to investigate potential narcotics possession.  In effectuating a *Terry* stop, police cannot "seek to verify their suspicions by means that approach the conditions of arrest."  *Florida v. Royer*, 460 U.S. 491, 499 (1983).  In other words, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  *Id.* at 500.  "A stop becomes unlawful when it lasts longer than is necessary to complete its mission, the rationale being that the authority for the seizure ends when tasks tied to the mission are, or reasonably should have been, completed."  *United States v. Clark*, 902 F.3d 404, 410 (3d

---

14:52 (2:52 p.m.) for both the dispatch and arrival time, and 16:06 (4:06 p.m.) as the "close out" time, suggesting that Sergeant Kivet was on the scene for approximately 73 minutes.  *See* Gov. Ex. 48.  Sergeant Kivet testified that the times in the report are "approximate" and "generally accurate," but acknowledged that they could "be off by a few minutes."  2T 155:22-156:6.  The times in the CAD are not inputted by the reporting officer, but rather by the dispatcher.  154:19-155:155-6.  Sergeant Kivet explained that when he leaves to attend a call, he calls dispatch and requests that they generate a CAD and the dispatcher enters the time of the call, and accordingly, the CAD reports indicates the time arrival and departure time based on the timing of the officer's call to dispatch.  *Id.*  The CAD also indicates a "clear time" of 16:06 (4:06).  *See* Gov. Ex. 48.  Sergeant Kivet explained that the clear time is "just the time the dispatcher finished off the CAD" because the dispatchers often fail to "close out" the CAD immediately.  2T 171:1-16.  Sergeant Kivet averred that the CAD was inaccurate and that he was not on the scene for 73 minutes as suggested by the "arrival" and "close out" times on the CAD.  2T 173:16-19.  The Court credits Sergeant Kivet's testimony in that regard.  Furthermore, the CAD's departure time is largely immaterial as the focus of the analysis, for the purpose of assessing whether the stop was unreasonably extended, is what time Sergeant Kivet *arrived*, and in that regard, the Robbinsville CAD is consistent with both Sergeant Kivet's testimony and his report.

Cir. 2018).  As explained, *supra*, the officers in this case had reasonable suspicion to believe that the vehicle was engaged in criminal activity based on Detective Maldonado's observations of Williams.  Indeed, that same reasonable suspicion that Williams was involved in drug possession, which justified the initial stop of the vehicle, equally justified a canine sniff of the Volkswagen Passat.  Obtaining and waiting for the canine dog was well-within the scope of the stop's inquiry, because it was directly related to the purpose of the stop: the officers' suspicion that Williams possessed heroin and that there was marijuana in the vehicle.  Additionally, the officers' suspicions were only further enhanced by the odor of marijuana emanating from the vehicle and the discovery of marijuana on West's person.  As will be discussed *infra*, the odor of marijuana gave rise to probable cause to investigate potential narcotics activity.

Furthermore, the continued detention while waiting for Sergeant Kivet and Quori to arrve did not unreasonably prolong the *Terry* stop.  Although there is "no rigid time limitation on *Terry* stops," *United States v. Sharpe*, 470 U.S. 675, 685 (1985), the Third Circuit has routinely held detentions of up to 80 minutes to be reasonable so long as the officers had reasonable suspicion of drug-related criminal activity and acted diligently in obtaining the canine officer.  *See e.g. United States v. Johnson*, 434 F. App'x 159, 163 (3d Cir. 2011) (finding that 45-50 minute "delay caused by the wait for the canine unit did not offend the Fourth Amendment, particularly since there was no evidence that the trooper was not diligent in pursuing this means of investigation."); *United States v. Leal*, 235 F. App'x 937, 942 (3d Cir. 2007) (finding 80 minute detention of suspect following traffic stop "may have bumped up against the outer limit of a *Terry* stop but did not cross it," where officers had reasonably suspicion and acted diligently); *United States v. Burton*, 288 F.3d 91, 99 (3d Cir. 2002) (30 to 45 minute delay not unreasonable where there was no evidence that officers "proceeded less than diligently" in requesting canine unit).  In this case, the

record reflects that Detective Ramos and Bernstein effectuated the stop of the Volkswagen Passat at approximately 2:41 p.m., and Sergeant Kivet and the canine officer arrived, at the earliest at 2:51 p.m. or at the latest 3:25 p.m., thus the other law enforcement waited sometime between 10 minutes and 40 minutes for Sergeant Kivet to arrive.  I need not resolve the factual question of precisely when Sergeant Kivet arrived because, regardless of the exact timing of his arrival, the stop was not unreasonably prolonged.[22]  At most the officers extended the traffic stop for forty-minutes to allow for the canine officer to arrive; this period of time is well-within the ambit of reasonableness.

### D.  The Warrantless Search of the Volkswagen Passat

Defendants argue that Detectives Ramos' actions exceeded the scope of the *Terry* stop, because there was no basis, after the four occupants were removed from the vehicle, to unlawfully extend the stop and continue the search for marijuana.  Wimbush Pre-Hearing Br. at 24; *see also* Williams Br. at 2.  In Defendants' view, "the smell of marijuana, if particularized as required would have allowed for the search of Jubri West, but not of the vehicle."  *Id*. at 36.

---

[22]     This finding holds true regardless of whether the initial justification for the stop was to investigate potential narcotics possession, or a motor vehicle stop to investigate the Volkswagen Passat's tinted windows.  Even assuming, *arguendo*, that the stop of the vehicle was only justifiable as a motor vehicle stop meant to investigate the vehicle's heavily tinted windows, the officers quickly developed probable cause to investigate potential narcotics activity once the officers smelled the odor of marijuana emanating from the vehicle, and thus the officers were not limited to investigating "the ordinary inquiries incident to" a traffic stop. *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (recognizing that law enforcement actions like "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are aimed at enforcing the traffic code and within the scope of a typical traffic stop, while "a dog sniff" is not and is only permissible so long as it "do[es] not measurably extend the duration of the stop" or the sniff is supported by reasonable suspicion of drug-related criminal activity); *see also United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (explaining that traffic stops are unreasonably extended when "an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes.").

In response, the Government argues, that following the valid stop, the warrantless search of the Volkswagen Passat, while it was still located on Hoffman street, was justified under the automobile exception.  The Government explains that probable cause arose from a combination of circumstances, including (1) when Detective Ramos smelled a distinct odor of raw marijuana coming from the inside of the Passat; (2) when Detective Ramos seized the heroin and marijuana, from Jubri West's pocket during the patdown search; and (3) when Quori, the canine unit, alerted the officers to the odor of narcotics in the Volkswagen Passat.  Gov't Post-Hearing Br. at 51-59.

Even assuming, *arguendo*, that the stop of the vehicle was only justifiable as a motor vehicle stop meant to investigate the vehicle's heavily tinted windows, the officers had probable cause to investigate potential narcotics possession once they smelled the odor of marijuana emanating from the vehicle.  *See United States v. Small*, 19-1344, 2020 WL 57626, at *4 (3d Cir. Jan. 6, 2020) (finding that although officers had reason to suspect defendant of drug dealing *before* they pulled him over, based on an informant's tip, the smell or marijuana emanating from the vehicle "corroborated and heightened their suspicion" contributing to the existence of probable cause).  Additionally, the canine unit's positive alert independently gave rise to probable cause to search the vehicle. *United States v. Pierce*, 622 F.3d 209, 213 (3d Cir. 2010) ("a dog's positive alert while sniffing the exterior of the car provides an officer with the probable cause necessary to search the car without a warrant.").  Under the automobile exception to the warrant requirement, law enforcement officers may seize and search a vehicle without a warrant if probable cause exists to believe that the vehicle contains contraband or evidence of a crime.  *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002).  "Where probable cause justifies the search . . . it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Donahue*, 764 F.3d 293, 300 (3d Cir. 2014).

In *United States v. Ramo*s, 443 F.3d 304, 308 (2006) the Third Circuit explained that "the smell of marijuana alone, if articulable and particularized" may established probable cause, so long as the officer can localize its source with sufficient particularity.  In *Ramos*, police officers drove between two vehicles and smelled the odor of marijuana.  *Id*. at 306.  They stopped, and searched one of the two vehicles.  *Id*. at 306.  The district court granted the defendant's motion to suppress the items seized from the vehicle, explaining that the officers lacked probable cause to stop the vehicle in the first instance.  *Id*. at 307, n 2.  On appeal, the Third Circuit reversed the district court, holding that the odor of marijuana was "sufficiently particularized" to give rise to reasonable suspicion, because the officers "smelled an identifiable marijuana odor" within three or four feet of the defendant's car and concluded, based on their training and experience, that the odor was coming from the vehicle.  *Id*. at 308-09.  However, the court questioned, without resolving, whether probable cause existed under the circumstances, because the smell could have come from either of the two vehicles.  *See id*. at 308 n. 5 ("[I]f our inquiry were whether probable cause existed, we might be inclined to agree with the District Court that the stop was not justified.").  Here, however, the smell of marijuana was particularized to the Volkswagen Passat: Detective Maldonado, an experienced narcotics detective, testified that once the occupants of the vehicle rolled down the windows, he immediately smelled the marijuana emanating from the interior of the vehicle.  *See United States v. Ushery*, 400 F. App'x. 674, 676 (3d Cir. 2010) (distinguishing *Ramos* and finding that automobile exception applied where officers testified that they "smelled the obvious odor of burnt marijuana coming from the vehicle," "smelled the odor of marijuana inside the vehicle," satisfying the probable cause analysis); *see also United States v. Jackson*, 682 F. App'x. 86, 88 (3d Cir. 2017) (finding the odor of marijuana to be particularized where officer testified that the odor traveled with the suspect).  Therefore, the automobile exception to the Fourth

Amendment's warrant requirement was satisfied, since the smell of marijuana was particularized and articulable, establishing the requisite probable cause to conduct a warrantless search of the Volkswagen Passat.   Although Defendants are correct in their contention that under *Terry,* investigative detentions and   motor vehicle stops must be both limited in scope, as well as temporally, once the officers smelled the marijuana, they were no longer bound by the confines of the *Terry* exception.  *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (explaining that traffic stops are unreasonably extended when "an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes.").

Additionally, the fact that marijuana was found on Jubri West's person prior to the search of the Volkswagen Passat did not preclude the officers from searching the vehicle.  *See United States v. Neal*, No. 17- 00255, 2018 WL 3008488, at *5 (M.D. Pa. June 15, 2018) (finding that officer's testimony that he smelled marijuana in the vehicle, both before and after suspect's arrest established probable cause for search and "[t]hat finding however is further bolstered by the actual discovery of marijuana and an additional glassine bag with two small vials of crack cocaine on Mr. Neal's person.").  At the time the officers conducted the search of the vehicle, they had probable cause to believe that the Volkswagen Passat may have contained both heroin and marijuana. At the outset of his surveillance, Detective Maldonado observed Williams exit 44 Laurel Place holding a yellow bag which were consistent with the size and shape of bricks of heroin.[23]   As the officers approached the vehicle, the occupants disregarded the officers instructions to roll down the windows, and Detective Ramos observed the vehicle "rocking," as if

---

[23]      The fact that Detective Maldonado was mistaken regarding the contents of the yellow bag, which contained ammunition rather than heroin, does not negate the existence of probable cause. *See Florida. v. Harris*, 568 U.S. 237, 249 (2013) ("we do not evaluate probable cause in hindsight, based on what a search does or does not turn up.").

the occupants inside were moving.  Once Defendants eventually complied with the officers' directives, Detective Ramos immediately identified the smell of marijuana emanating from inside the car.  Then, while removing Defendants from the vehicle prior to the patdown search, Detective Ramos observed that the yellow bag was nowhere to be seen.  Thereafter, the canine, Quori, indicated with a positive sniff, the presence of drugs in the Volkswagen.  Under the totality of the circumstances, the officers were justified in believing that Williams possessed heroin and had secreted the heroin in the vehicle.[24]

### E.  Misstatements and Omissions in the Search Warrant Affidavit

Defendants identify various false and/or misleading statements in the search warrant affidavit drafted by Detective Sergeant Ordille, which they assert, render the search warrant invalid under the framework set forth by the United States Supreme Court in *Franks v. Delaware*, 438 U.S. 154 (1978).  Def. Post-Hearing Br. at 20-23.  The Government acknowledges that while "several of defendants' challenges are overstated . . . a few are well taken," but contends that, overall, the search warrant affidavit "does not reflect a conscious or reckless effort to deceive— nor did it have any capacity to deceive—the issuing judge as to probable cause."  Gov't Post. Hearing Br. at 43.

---

[24]     Detective Ramos also testified that he saw "several grains of rice" near the driver's side floorboard.  2T 51:5-13.  The Government argues that this observation added to the existence of probable cause.  Gov't Post-Hearing Br. at 60.  Although the Government, in its briefing, submits that rice "is used to keep heroin dry," none of the law enforcement witnesses who testified at the hearing identified the import of the grains of rice or testified that they were indicative of narcotics activity.  *Id*. at 34.  Furthermore, while other grains of rice located inside of the trap compartment of the Passat were contemporaneously photographed, the grains of rice on the floorboard of the vehicle were not collected into evidence or photographed until October 16, 2019.  1T 207:3-25.  The after-the-fact photograph of the rice reflects a single broken grain of rice on the vehicle's floorboard.  *See* Ex. 43, October 2019 Photographs of the Volkswagen Passat.  In light of those circumstances, I do not find that the grains of rice contributed to the existence of probable cause, nor do I find Detective Ramos's testimony to be credible in this respect.

Here, the validity of the search warrant is immaterial because, pursuant to the automobile exception, law enforcement could search the entirety of the vehicle, without a warrant, regardless of whether they had the opportunity to seek a warrant. *Donahue*, 764 F.3d at 300 (explaining that under the automobile exception, law enforcement may search "every part of the vehicle and its contents that may conceal the object of the search" and "can search an impounded vehicle without a warrant even though it has secured the vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search"); *Burton*, 288 F.3d at 101 (explaining that pursuant to the automobile exception officers could have searched the vehicle on the scene, rather than seizing it pending the issuance of a warrant). Thus, I need not make a finding regarding the validity of the search warrant because law enforcement was not required to seek a warrant. *See e.g. Smith v. McCollough*, 97 F. Supp. 2d 626, 635 (M.D. Pa. 1999), *aff'd* 225 F.3d 650 (3d Cir. 2000) (finding that because the automobile exception to the warrant requirement applied, petitioner's claims regarding deficiencies in search warrant were moot); *United States v. Hudson*, No. 16-028B2, 2017 WL 2589400, at *6 (W.D. Mo. June 14, 2017) (noting that even if a search warrant authorizing search of a vehicle was not validly issued, "suppression would still not be appropriate because the warrant in this case was superfluous" as the officers had probable cause to search the vehicle prior to issuance of the search warrant, based on the results of a canine sniff); *United States v. Martinez*, 78 F.3d 399, 401 (8th Cir. 1996) (concluding a search may be authorized under the automobile exception even when law enforcement obtains a search warrant later determined to be invalid). Accordingly, I will not engage in a *Franks* analysis. Nonetheless, based on the multiple serious misstatements in the warrant application, I must address two specific misstatements

43

identified by Defendants: the statements regarding the confidential informant's tip and the purpose of law enforcement's surveillance efforts on September 6, 2018.[25]

In the search warrant affidavit, Detective Sergeant Ordille attests, "[a]fter conducting the motor vehicle stop [on September 4, 2018], I was advised by a confidential informant that the captioned vehicle contained a hidden compartment in the rear passenger seat area and that Wimbush used to stash quantities of illegal narcotics and firearms." Ex. 9, ¶7. At the suppression hearing, it was revealed that Detective Sergeant Ordille never spoke to the confidential informant. 1T 93:6-7. Rather, Detective Cox spoke to the informant and, in fact, she was the only member of the law enforcement team to have any contact with the confidential informant. 1T 149:16-19. Detective Cox testified that Detective Sergeant Ordille never spoke to the confidential informant, himself, and that she simply informed Detective Sergeant Ordille of the location of the trap. 1T 93:6-10.

Furthermore, on September 2, 2018, when the confidential informant provided the information regarding the trap compartment, Detective Cox was aware that according to a

---

[25]    These two misstatements are not the only ones identified by Defendants. However, I need not recount the remaining statements. As explained, *supra*, because the search was permissible under the automobile exception, I do not engage in the complete *Franks* analysis. Furthermore, even assuming the *Franks* analysis was applied, Defendant's motion would fail at the second phase of the *Franks* analysis. *See United States v. Yusef*, 461 F.3d 374, 384 (3d Cir. 2006) (explaining that in order to invalidate a warrant under *Franks* "[t]he defendant must ultimately prove by a preponderance of the evidence that: (1) the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements that such statements or omissions are material, or necessary, to the probable cause determination."). After supplementing the search affidavit with the improperly omitted facts and eliminating the misstatements, as required by the *Franks* framework, I, nonetheless, find that the misstatements and omissions, while significant, were not material or necessary to the probable cause determination, due to the simple fact that the search warrant affidavit correctly states that the canine officer indicated the presence of drugs in the Volkswagen Passat. That alone would be sufficient for the judge authorizing the warrant to find probable cause. *Pierce*, 622 F.3d at 213 ("[A] dog's positive alert while sniffing the exterior of the car provides an officer with the probable cause necessary to search the car without a warrant.").

September 1 2018, FBI report, drafted by Agent Kolvek, that the confidential informant had engaged in criminal activity and the FBI was going to terminate him as a source.  *See* Williams Ex. 3; *see* 1T 152:1-20.  The confidential informant was not officially terminated until September 30, 2018.  *Id.*  Detective Cox did not relay the information regarding the confidential informant's criminal activity to Detective Sergeant Ordille.  1T 93:6-14.  That criminal activity would impact presenting this source as "reliable."   Nonetheless, when asked whether she characterized the informant as reliable when speaking with Detective Sergeant Ordille, Detective Cox testified "I would say that I did. I don't think it was relayed into the affidavit that way."  1T 124:9-12.

Neither Detective Sergeant Ordille nor Detective Cox provided an adequate explanation for why the search warrant affidavit falsely indicated that Detective Sergeant Ordille directly communicated with the informant.  When questioned as to why the search warrant affidavit was written in such a deceptive manner, Detective Sergeant Ordille explained that "[t]here was an ongoing wiretap investigation that we were attempting to keep confidential, as well as the identity of the confidential informant."  2T 201:17-19.  Detective Sergeant Ordille acknowledged that he could have also achieved those goals by writing "I was advised by other members of law enforcement," rather than misrepresenting the nature of the interaction with the confidential informant. 2T 236:1-9.  Indeed, in drafting search warrant affidavits, law enforcement is permitted to rely on and report on the information of another law enforcement officer, when disclosed.  *See United States v. Ventresca*, 380 U.S. 102, 111(1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number"); *United States v. Yusuf*, 461 F.3d 374, 385 (3d Cir. 2006) (explaining that "information received from other law enforcement officials during the course of an investigation is generally presumed to be reliable" and may be utilized in a search warrant

45

application).  Yet, apparently, such disclosures, that the law enforcement affiant is relying on information from other law enforcement officers, are routinely not made on warrant applications submitted by the Trenton police department.  Indeed, Detective Cox admitted, "[t]he information that we receive is often just interchangeable and that's how we write it."  1T 41:23-24; *see also* 1T 136:13-14.  This testimony is eye opening and should be remedied.

The search warrant affidavit's failure to disclose that the affiant, Detective Sergeant Ordille, did not speak to the confidential informant, and instead was relying upon information from another officer is deceptive and lacks candor to the Court.  Law enforcement is already given great latitude in drafting a search warrant affidavit; they are permitted to rely on the collective knowledge of the department, as well as hearsay.  Here, however, the affidavit is written in the first person and affirmatively states that Detective Sergeant Ordille spoke to the confidential informant.  This misrepresentation is particularly disconcerting in this context, because the Supreme Court has made clear that "an informant's 'veracity,' 'reliability,' and 'basis of knowledge' . . . [are] 'highly relevant in determining the value of his report.'"  *Alabama v. White*, 496 U.S. 325, 328 (1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983)); *see also United States v. Valentine*, 232 F.3d 350, 354 (3d Cir. 2000) (explaining that the "Supreme Court uses a flexible standard that assesses the relative value and reliability of an informant's tip in light of the totality of the circumstances").  As the record makes clear, Detective Sergeant Ordille could not have personally attested to any of the circumstances impacting the value or reliability of the confidential informant's tip, since he did not deal with or directly communicate with the informant.  Indeed, the actual circumstances under which the tip was obtained indicate that it was hearsay based on hearsay.  When pressed on the reliability of the tip, Detective Cox revealed that the confidential informant "just overheard" the information.  1T 117:16-19.  The affidavit's failure to

clearly identify the true circumstances surrounding the tip  prevented the reviewing judging from probing, if he or she found it necessary, the sufficiency and reliability of the tip.  These infirmities in the affidavit's assertions are only further compounded by the discovery that the confidential informant had committed criminal activity, and that the FBI had made the determination to terminate him.[26]

Next, the search warrant affidavit asserts that "[o]n September 6, 2018, members of the Trenton Police Department violent crimes unit and Detective Alex Maldonado of the Ewing Police Narcotics Unit conducted a surveillance in the area of the 800 block of Stuyvesant Avenue due to the recent shootings."  Ex. 9, ¶8.  The suppression hearing testimony unequivocally establishes that this statement was false.  Detective Sergeant Ordille acknowledged the officers were not surveilling the area because of the recent shootings, but were acting at the Task Force's direction "to assist the FBI."  2T 241:92-43:9.  He went on to explain that he described the purpose of the surveillance in that fashion "[t]o keep the wiretap investigation from being known," and protect the integrity of the federal investigation.  2T 242:21-23.

The Government contends that "[Detective] Sergeant Ordille's use of these five words ["due to the recent shootings"] accurately captured the thrust of what quickly developed, albeit not the initial reason for that afternoon's surveillance.  At worst, this is an unfortunate choice of five words; clearly, it was not a deliberate attempt to deceive."  Gov't Post-Hearing Br. at 49.  This assertion is undercut by Detective Sergeant Ordille's own testimony, which clearly establishes that he deliberately obfuscated the purpose of the surveillance.  Even if well-intentioned, Detective Sergeant Ordille deliberately misstated the information in the search warrant affidavit.

---

[26]     The Government has represented that Special Agent Kolvek, not Detective Cox, made the decision to terminate the confidential informant and completed the relevant paperwork.  *See* Gov't Post-Hearing Br. at 17 n. 4.

Both of the statements regarding the interaction with the confidential informant and the misrepresentation of law enforcement's purpose are affirmative acts of deliberate deception. The failure to apprise a reviewing judge of all the material facts relevant to the law enforcement investigation, particularly in the context of hearsay information obtained from confidential informants, and attesting to the reliability of informants, is unjustifiable. Time constraints and pressures often arise during a criminal investigation, which is why law enforcement is not held to a standard of absolute, exacting accuracy; but, there is no excuse for an officer, swearing on a search warrant affidavit, to not make all reasonable attempts to ensure the accuracy and completeness of the information provided to the reviewing judge. Absent candor and diligence on the part of the affiant, the judge reviewing the warrant application cannot perform his or her role in safeguarding the warrant process. *See Dempsey v. Bucknell Univ.*, 834 F.3d 457, 469 (3d Cir. 2016) (explaining that "[i]f, however, the officer does not provide the neutral magistrate with an accurate affidavit of probable cause, the protection afforded by the magistrate's review is lost; the magistrate will be unable to assess the circumstances for probable cause because he will not know what those circumstances actually are"). Unlike the other misstatements and omissions identified by Defendants, these particular misstatements are reflective of more than mere carelessness or negligence on the part of the drafting officer. They are the product of wholly inappropriate police practices, which are tantamount to lack of candor to the Court.

The above-identified misstatements in the search warrant were not the only errors which occurred during the search and arrest of Defendants. In many respects, law enforcement's investigation was marked by easily avoidable errors and carelessness, which obligated this Court to heavily scrutinize the officers' conduct, and engage in a searching analysis to be assured of its constitutionality. Aspects of the investigation, such as the discrepancy between Laurel Place and

Laurel Avenue and Detective Cox's failure to document the September 4, 2018 contact with the confidential informant, are indicative of haphazard recordkeeping and neglect.  While these errors were not sufficient to find that Defendants' Fourth Amendment rights were violated, they nonetheless gave the Court pause and reason to question the officers' credibility.  Such practices complicate the judiciary's role as the protector of individual liberties and may interfere with the Court's ability to assess the proprietary of law enforcement's conduct.  Nonetheless, despite these errors and the significant misstatements in the affidavit, I have found that a search warrant was not required, and an independent basis existed for the search based upon the automobile exception and the positive canine sniff alerting to the odor of narcotics.  Therefore, the evidence seized in connection with the motor vehicle stop on September 6, 2018, including the drugs seized during the patdown search of West, the items found in the car during the stop, and the items found in the trap compartment of the Volkswagen Passat, are not suppressed.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion to Suppress the heroin and marijuana found during the patdown search of Jubri West, as well as the guns, ammunition, and drugs found in the car and in the trap compartment of the Volkswagen Passat is **DENIED**

Dated: April 15, 2020                                    s/ Freda L. Wolfson

                                                         Freda L. Wolfson
                                                         U.S. Chief  District Judge

49